# CASES DETERMINED

BY THE

## ST. LOUIS AND THE KANSAS CITY

# COURTS OF APPEALS.

---

### MARCH TERM, 1892.

---

ANTOINE DE HATRE, Appellant, v. CHARLES DE HATRE
*et al.*, Respondents.

#### St. Louis Court of Appeals, May 10, 1892.

Practice, Appellate: JUDGMENT FOR RIGHT PARTY. The judgment in
this cause was affirmed on the ground that, under all the evidence, it
is for the right party.

*Appeal from the St. Louis County Circuit Court.*—HON.
W. W. EDWARDS, Judge.

AFFIRMED.

*R. H. Stevens, Jr.,* and *Alex. McElhinney,* for
appellant.

*R. Lee Mudd* and *F. A. Heidorn,* for respondents.

THOMPSON, J.—This was an action of replevin
prosecuted by the plaintiff against his two sons, Charles
De Hatre and Thomas De Hatre, to recover eight
hundred bushels of wheat. They answered jointly by
a general denial. The cause went to trial before the

judge sitting as a jury, and resulted in a judgment for the defendants from which the plaintiff prosecutes this appeal.

For the purpose of retaining the wheat, so as to be able to dispose of it, the defendants gave a delivery bond, in which their mother, Martha Ann De Hatre, and four others joined as sureties.

The plaintiff rested his right to recover solely upon his own testimony. His testimony tended to show that, in the winter of 1887 and 1888, he employed his son, Charles De Hatre, to take charge of his two farms as a hired man and run them for him, and that this son, combining with the other defendant and with other members of the family, dispossessed him of all management or control over the place, denied his ownership in any of the property about the place, and in the crops raised on the farm; in short, ousted him of his marital and proprietary rights in respect of the farm and the personal property thereunto belonging, and the crops raised thereon, as much as though he had been a total stranger, but with the exception that they allowed him to remain at the homestead, living with his wife and family as he had previously done. He was nearly eighty years of age; his wife was about seventy-three years of age; he had raised fourteen children, and he admitted that he had become too old to carry on the farm in person, and did not claim to have done any work in and about the raising of crops on the farm, or any other work, beyond doing a few chores about the house for his wife.

On the other hand, the defendants gave evidence by themselves, by another brother, by a sister, and by third persons with whom the business connected with the farm had been transacted since this arrangement commenced, tending to show that, in the winter of 1887 and 1888, the plaintiff, being unable to carry on

the farms, the farms having run down, the whole property having become involved in debt, the premises having grown up to weeds, the old man being unable even to procure suitable food for the family, so that, as the sister testified, they had to go to bed hungry, one of the farms being incumbered with a deed of trust and likely to go to sale, sent for the defendant Charles De Hatre, his son, who was then working for himself at another place, and agreed with him,—in short, entered into a sort of a family arrangement, whereby it was agreed that this son should take possession of the place in the character of a hired man working for his mother, not for his father, at $20 a month, except for two summer months, when he was to have $25 a month; that the farm should be carried on by this son for his mother, and in her name, and that he should account to her for the crops raised upon the farm. It further appears that he entered upon this arrangement, and that later in the year 1888, some time in the month of May, the other defendant, his brother, Thomas De Hatre, commenced to work with him. There was no evidence tending to show that Thomas De Hatre ever had the possession or dominion over anything connected with the farm, or over the wheat which is the subject of this action of replevin; and, since this family arrangement was made, all transactions with strangers were had in the name of the mother. Accounts were made out to her and bills were paid to her, and there is no evidence to the contrary. This arrangement continued during four cropping years, 1888, 1889, 1890 and 1891. The old man grumbled frequently about the arrangement, and there were frequent family quarrels, but he submitted to it and lived at the family homestead, cohabiting with his wife as before, and eating at the table with her, and the children, these defendants, and others, as before. Finally, when the

fourth crop of wheat had been raised and threshed and was about to be sold, he, acting under the advice of a lawyer, conceived the idea of pouncing upon it by this action of replevin. Preliminary to this action, and under the legal advice which he had received, he made a demand upon the defendants for the possession of the wheat, and then sued out this writ. The evidence further showed, without controversy, that the defendant Charles had, during this whole period, managed and worked the property faithfully and efficiently; that he had faithfully accounted to his mother for what he had done on the farm, and for what he had realized from the sales of the crops, though he had refused to account to his father beyond the courtesy of answering his questions, and telling him what he had done. It also shows that he had raised good crops during that time; that he had paid off many of the debts; that he had supported the family, so that they did not have to go hungry to bed any more; and that the farm, which was incumbered with the deed of trust, having been brought to sale by the trustees, had been bought in for the mother, and the title vested in the son Charles to her sole and separate use. In short, everything had assumed an improved, prosperous and gratifying condition under the management of this young man, who, we feel bound to say, upon this record, is the kind of a son that aged and dependent parents should have.

Upon this state of facts it is very clear that the assignment of error, that the finding of the circuit judge is against the evidence, is not well taken; and we are prepared to affirm this judgment as being for the right party. It would be a great wrong, not only to this young man, but also to his aged mother, to the other members of the family who are at least under a moral obligation to support their aged parents, and to

De Hatre v. De Hatre.

the aged plaintiff himself, to allow him to terminate this arrangement, after the fourth crop had been raised, by suddenly pouncing upon that crop by means of a writ of replevin,—thus thrusting the household back into the poverty from which this son, with the aid of his brother, the other defendant, has rescued it. A court of equity, dealing with the facts, would never disturb a family settlement under such circumstances; because such courts are very loth to disturb family settlements, except for cogent reasons and upon strong evidence. A court of law, exercising, as in this case, the powers of a jury as well as those of a judge, will, for like reasons, affirm such a settlement, unless the plaintiff is entitled to have it broken on clear evidence and on strictly legal grounds.

A good deal has been offered in argument about the "marital rights" of the plaintiff. The marital rights of a husband, in so far as they relate to property, are rights which he can waive by contract if he sees fit; and all the evidence in the case, with the single exception of the general statements of this plaintiff on the witness stand,—in which evidence we include his own conduct during the period of four years,—shows that he waived his marital rights in respect of the management of this farm, and has made his wife the tenant of it in his place to carry it on with the aid of this son for the period of four years; and it would be the height of injustice to allow him to break the arrangement by the retrospective act of seizing, under judicial process, the crop when raised and harvested, without giving any previous notice of his intention so to do; for his own evidence shows that he never notified any of the other parties to this family arrangement of his purpose to assert his so-called "marital rights" in this way, until he made the demand for the wheat, which he was

advised to make as the preliminary step to the bringing of this suit.

There is a further evidentiary fact which strengthens the conclusion at which we arrive, but which we do not regard as necessary to that conclusion. It is that the major part of this wheat was raised on the separate farm known as the McCullough farm, or the bottom farm. This was the farm which was incumbered by the deed of trust already spoken of. This deed of trust was executed on the twenty-first of November, 1883. The property went to sale under this deed of trust and was bought in by Charles De Hatre, one of these defendants, for his mother, and on the twenty-seventh of April, 1887, the trustee conveyed the property to Charles, in trust for the sole and separate use, benefit, enjoyment and behoof of his mother, Martha Ann De Hatre, her heirs and assigns, and entirely free from all control, restraint or interference on the part of Antoine De Hatre, her husband. This shows that the legal title was not in the plaintiff at all as to the tract of land on which a greater portion of the wheat is shown to have been raised, but that it was in his son who was seized thereof as trustee to the sole and separate use of the plaintiff's wife. The evidence entirely fails to show how much of the wheat was raised on this twenty-seven-acre tract, and how much of it was raised on the home farm. The evidence utterly fails to make out a case of the wrongful confusion of goods, under which the defendant Charles could be made a wrongdoer in respect of the whole amount of the wheat by reason of mingling that which he had raised upon land, of which the legal title was in him, with that raised upon the land, of which the legal title was in the plaintiff; but on the contrary, on the state of facts disclosed by this evidence, it was incumbent upon the plaintiff, if he would recover the wheat grown

De Hatre v. De Hatre.

upon the home farm, the legal title to which was in him, to make seasonable claim and institute process for the purpose of recovering that wheat seasonably, before it had become mingled with the other wheat by the son, acting under the family arrangement already spoken of. On the contrary, if he were allowed to succeed in this suit, he would succeed in recovering from the son a large quantity of wheat, which the evidence indisputably shows to have been raised by the son upon land, of which the legal title was in the son and the beneficiary title in the mother.

We do not think it necessary to dwell upon the declarations of law given by the learned judge who tried the case sitting as a jury. In such cases, where the facts are controverted, declarations of law are important as indicating the theories of the law which the court applied to the hypothetical states of facts in evidence. In those cases, if the declarations of law applicable to hypothetical states of facts are erroneous, the judgment must be reversed, exactly as though a jury were in the box. But, in this case, admitting the objections which are taken to the instructions refused, we do not see that any error prejudicial to the plaintiff is involved. Two of these instructions declared that the execution by the defendants of the forthcoming bond, with their mother as surety, was an admission on her part of possession in the defendants, and was an admission on their part of possession in them. So far as the defendant Charles is concerned, he never denied possession. His position is that he holds possession as bailee of his mother. Undoubtedly, he is the active possessor as his mother's bailee, though she is, in theory of law, in possession. This inquiry, therefore, became substantially immaterial; because, upon his testimony, if the plaintiff had a meritorious right of action, it was sustainable against Charles Without

holding whether or not the execution of the forthcoming bond is an estoppel against the mother and the two defendants on the question of the fact of possession, we, therefore, hold that the refusal of these instructions was immaterial to the rights of the plaintiff, because the refusal of them does not indicate to our minds that the rights of the plaintiff were made to turn on that inquiry.

Perceiving no prejudicial error in the record, and the judgment being manifestly for the right party, it will be affirmed. All the judges concur.